Case 19-1132, Paul Torres v. Duncan MacLaren, argument not to exceed 15 minutes per side. Ms. Fitzharris, you may proceed for the appellant when ready. Good morning, Your Honors. Good morning. May it please the Court, Colleen Fitzharris, Federal Community Defender on behalf of Paul Torres. I'd like to reserve three minutes for rebuttal. Very well. When the Court looks at this record as a whole and practically, it should come to the conclusion, the definite and firm conclusion, that Mr. Torres did not receive accurate advice about his sentencing exposure if he proceeded to trial. And there are a number of reasons. I understand this is overturning some factual findings by the District Court, but there are a number of reasons to do so. And some of these are guided by the guideposts laid out in Lewis v. Dredke and also a few practical considerations that this Court took consideration of, most recently in Carden v. United States, looking at the realities of what's going on here. Can I ask you just a practical question that bothers me about this? I mean, you make a lot of good arguments. I think you've really done a nice job on behalf of your client. But it seems like this just comes down to credibility. And the district judge, you got a hearing, which is unusual nowadays, and the district judge looked your client in the eye and heard his story and just didn't believe him. So, yes, you have things that are on your side of the ledger and there are some other things on the other side, but what do we do if the district judge just doesn't believe the claim? There are a couple points. Why is that clear or whatever the standard is? One thing that's remarkable about Judge Michelson's opinion is that she actually said that based on his presentation at the hearing, she would believe him. But instead she focused on some, frankly, perceived inconsistencies, minor things that are not material to the outcome of this case. The thing that needs to be established is what, if anything, Paul Torres was told about his risks of going to trial. And Judge Michelson focused on first a perceived inconsistency about how Mr. Torres described his meeting with Mr. Archer. I don't believe that these are actually inconsistencies. These are iterations of the same basic problem. He used the word refused to talk about certain topics in one affidavit and then he said he was dismissive in another. I thought he said in his affidavit that he did tell Mr. Archer about the advice that he supposedly got, and then I think in the evidentiary hearing he says he didn't mention that or maybe vice versa. Am I misunderstanding the record in describing what seems to be that inconsistency? I think the inconsistency has come down to differences between the process of affidavit writing, none of which were drafted, frankly, by Mr. Torres, and the practical realities of an evidentiary hearing where somebody can actually explain what was going on. We're also talking about something that happened many years later. What Mr. Torres was very clear about is that he talked to Mr. Archer extensively or he tried to talk about why it was that his sentence was so much higher than anything he ever expected. I guess one thing that makes it a little tougher to accept his version of events is who in the world would think that you're going to get the same sentence on these three charges, I think it was, if you go to trial that you'd get if you cut a plea deal early. It just facially seems kind of hard to believe. Perhaps to people who are experienced in the legal system and trained in the legal system, this is one of the things that the Supreme Court identified in Michigan v. Halbert as an issue. Sixty-eight percent of indigent defendants do not have a high school education, and Paul Torres falls into that group. He had never been to prison before, ever. He was relying very much on his attorney to explain to him the sentencing exposure. The guidelines and the sentencing structure in Michigan is frankly quite complicated. At the time there were mandatory guidelines and there are a number of factors that they have to take into consideration and they're very complex, frankly in many ways more complex than the federal sentencing guidelines. Plus you add on there these statutory enhancements involving doubling, sometimes tripling the guidelines, and then the always confusing nature of consecutive and concurrent sentences that frankly confuses some lawyers to this day. So when we say who in the world could believe that? Somebody who, like Mr. Torres, is unfamiliar with the legal process. And this is why... And I understand you have a lot of, where the brief has a lot of criticisms of his lawyer, but what lawyer would be under the impression that that's sort of the way that these things work, particularly in this county as I understand it? Perhaps, but Mr. Torres, and what's very clear from Mr. Archer's contemporaneous notes and also his memory at the time, continued to be confused about why it was that he was sentenced, could have been sentenced in the way that he was. He got that impression from someone, from Mr. Farah. Or it could have been your point that he just doesn't know much and he goes to trial, gets slammed, and he's just surprised because he doesn't know much about what to expect. But even if he's surprised, it is ineffective, it is deficient performance for an attorney not to advise a client about their sentencing risk if they go to trial. I mean, that's been established for many years in this circuit. In Smith, in Morris, in Suaf, this court has said repeatedly that an attorney must advise someone about their sentencing exposure. So, you know, putting aside the question of whether Mr. Farah, you know, had said to him explicitly the words, there's no possible risk of going to trial in this case, roll the dice. The fact, if he didn't tell Mr. Torres that his sentencing guidelines could be doubled, that is deficient performance. If he did not explain that the sentences could be stacked, that is deficient performance. And what we have and what the record makes very clear on a whole is that Mr. Torres, for a very long time, did not understand that that was possible. What was your client's defense at trial? He had some defense. Right. So there was an attack on the credibility of the informant. But by the time Mr. Torres got to appeal, he had kind of left aside the issue of guilt or innocence at trial. It really was this complete shock about what happened to him at sentencing which he learned was possible for the first time in his pre-sentence interview with a probation officer. But if he had a defense, if he was attacking the informant who, what, he sold cocaine twice to this government informant, right? Yes. And, I mean, so maybe he knew that, yeah, I was taking a risk, but it was a risk worth taking because, hey, instead of pleading guilty to one count, I might get off totally. And, of course, if you gamble and lose, well, you just lost. Sure. But when you look at credibility, this court has said, you know, even when somebody is maintaining their innocence, that is not in itself reason enough to reject the person's statement that they would have accepted a plea offer if they had been properly advised. Right. And that's where we get back, though, to the credibility determination is, did, in fact, he receive this advice from Mr. Farrah? If he did, it is ineffective assistance to counsel. But if he didn't, then, no, there's no ineffective assistance to counsel. And that's what you're trying to overcome, I guess, is the district court's determination that he did not get that advice from Mr. Farrah. Of course, we don't have Mr. Farrah around. Mr. Farrah has, what, been disbarred and his record is destroyed and he doesn't remember much, and that's a problem. That is a problem. And, you know, Mr. Farrah's disciplinary and personal issues that were going on at the time, you know, they provide context, again, important context about what was going on in Mr. Farrah's life and why it might be that somebody who maybe for a long time had been practicing at a competent level and routinely advised clients, but maybe in this particular case dropped the ball. It seems like the problem here is that even if you credit his now saying that he didn't understand this at the time that he entered his plea, you then juxtapose that against what happened next. So you say he first learns about this when he meets with the probation department. It then becomes an issue in sentencing. His lawyer argues about it. He knows it from that point forward. He doesn't put anything in the direct appeal. And this doesn't, it just doesn't seem to pass the smell test, that this doesn't pop up until I don't know how many months or years later it was, but it was quite a while. Well, on page 104 and 105, Mr. Torres explains why, and this is, again, why I want to come back to the practical realities. A lot of times defendants don't know what information to provide their attorneys. Mr. Torres had never heard the case Strickland v. Washington before in his life. And so at 104, he describes what it was he realized for the first time and thought to even tell someone for the first time about the advice of his counsel. And that's when he was reading with his legal writer, one of the legal writers in prison, and this took a little bit of time. It required that legal writer asking him, what did your attorney say, what were the plea offers? Mr. Archer never asked those questions, in part because Mr. Archer came to the meeting intent on trying to get him to dismiss the appeal in the first place. A lot of these things, people go to law school to help spot issues, and a lot of spotting issues requires asking the right questions, thinking what happened. And what Mr. Archer did not do is ask Mr. Torres a very simple question. Were you made any plea offers? What were they? What did your attorney tell you about those offers? What I still would like you to explain about that is that he's concerned about what his sentence is going to be. He's concerned about whether it's going to be doubled up and whether it's going to run consecutively or concurrently. You say he was told that he'll get the same amount of time. He clearly knows that that prospect was not likely when he met with a probation officer. He's there when he gets sentenced. He hears the lawyer argue in his favor about doubling and cumulative. So it's not like he didn't know anything about this until he gets to prison later on and he talks to a writ writer. A lot of that has to do with, again, what you think to tell. He didn't know it was a legal claim to say that my attorney has misadvised or failed to advise me about this. It's something that you might want to tell someone in a brief. He did not know, as he said repeatedly, he was hoping for some guidance from his attorney, Mr. Archer, which makes a lot of sense. The claim is that he was told he would get the same amount of time. Correct. Whether he went to trial or not. He knew as of the meeting with the probation officer that was not true. Potentially. He told the probation officer who said that was a possibility, but then she assured him that's probably not going to happen. Then he hears the argument his lawyer makes before the sentencing judge. Now he actually hears the exchange between the government and his own lawyer about that very subject, yet he still remains silent, and he assures the judge in the plea colloquy that he's satisfied with his attorney's advice. So it just seems like there's a lot of things you want us to do. There are things on your side of the ledger, I agree with that completely, but there are a lot of things you just want us to ignore. May I answer, Your Honor? Oh, yeah, please. A lot of this, again, Mr. Torres explains, has to do with the stress of sentencing. So all of a sudden he's at the sentencing hearing, he's still hoping, believing that the sentence will run concurrently, and so he does not tell the judge that he's unsatisfied with his attorney. Again, he still has been assured that it's going to be okay. And then it happens and he's rushed off to prison, and it's, again, it's a shock. He was suddenly sentenced to 11 1⁄2 to 120 years in prison. It's not something that was immediately on his mind. And so to discredit him just because he did not know exactly what was important to share with an attorney I think is nitpicking when it's unnecessary when you're dealing with somebody who is really unfamiliar with this process. Very well. You'll have your rebuttal from Mr. Banghart Lynn. Thank you. Your Honors, and may it please the Court, Linus Banghart Lynn, Assistant Attorney General for the State of Michigan, on behalf of the Respondent Warden, requesting affirmance, because Mr. Torres hasn't shown that the district court erred, much less clearly erred, in finding Mr. Torres not to be credible in his claims not to be shown. I think I'm going to begin with responding to a couple of mistakes that I heard my sister make just now. At one point she did, because they just require correction, at one point she said that the district court said that if it were just based on his evidentiary hearing testimony she would believe him. That's not correct. The order said that she might believe him, and I think that's an important distinction. Well, I think it's an important distinction, and I wanted to point it out. She said she might believe him. That implies she might not. So the inconsistencies are important, obviously. Another thing is that I have just heard for the first time that there is also an ineffective assistance claim based on Mr. Fara's failure to advise Torres at all with respect to consecutive sentencing. That's a brand-new claim that we have not been presented with, we haven't been prepared to defend against. I think that the claim has always been that Mr. Fara affirmatively told Mr. Torres he could not receive consecutive sentence. To now morph that claim into one that Mr. Fara failed to tell Mr. Torres, that's a different claim, and I would ask the court not to engage that. But, again, it all comes down, regardless of the form of the claim, to the credibility of Mr. Torres, which is shot based on all of his inconsistencies, and the district court didn't clearly err in finding so. I want to respond to two of the things in the reply brief as well, because this is my first chance to do that. The reply brief says that we conceded that Torres is the only one who recalls the conversation with Fara. That's not correct. We couldn't concede that because I have no way of knowing whether Mr. Torres recalls this conversation with Fara. I would concede that Mr. Fara doesn't recall it. I can't concede that Mr. Torres does recall it. So that's not a concession we've made. Didn't he testify about it? Yes. Then, you know, at least the record here would suggest Mr. Torres remembers it. I would concede that there is evidence to suggest that Mr. Torres remembers it. I don't believe that evidence is credible. I think that it is possible Mr. Torres remembers it and he's lying about it. It's possible Mr. Torres doesn't remember it and is making it up. I don't know which one it is. It's not a concession. The second point that's in the reply brief is this notion that we've repeatedly argued that the affidavits are not credible because they're self-serving. Two problems with that. We haven't repeatedly argued that. And second, that would be fine if we had argued that. This court has held that the fact that an affidavit is self-serving is something that can be taken into account in assigning weight and credibility. The cases that Mr. Torres cites to the contrary are all cases in which the district court has either denied an evidentiary hearing or made a ruling on summary judgment based on discounting an affidavit because it's self-serving. We've never said toss this affidavit out, don't consider it at all because it's self-serving. That's a different argument. That would be error. Well, I mean, why don't we kind of skip the procedural arguments about this case and maybe talk about the merits of the appeal. Yes. Doesn't he have a point that these inconsistencies that you're citing, that the district court cited, I mean, they're fairly fine distinctions themselves to say that a criminal defendant should have necessarily understood the difference between what he's saying in the affidavit about whether he had a certain conversation about an ineffective assistance claim with his lawyer and then what he says in the evidentiary hearing. I mean, can't you smooth that stuff out pretty credibly by saying he just doesn't understand some of the distinctions that we as lawyers understand? No, Your Honor, and the reason is because this isn't really a legal question. This is a factual question about the substance of his conversation with Mr. Archer. In his motion freely from judgment, he says, I told Mr. Archer about all of these issues. And in his affidavit, he says, Mr. Archer refused to talk with me about this. And if I had known that I could file a standard forebrief, I would have done so and I would have raised these issues. So we're not talking about the fine points of Strickland and Lafler, which hadn't come out yet at the time of appeal. We're talking about the simple fact of did he tell Mr. Archer about this claim as he unequivocally says he did, or did he not tell Mr. Archer about this claim as he unequivocally says he did not? I mean, that's equivocation, right? If you've got two at the hearing, he says, no, I didn't know what issues to raise. I didn't know. I didn't tell him anything. He didn't refuse to speak with me about anything. It's a complete 180 in his testimony between his first affidavit and second affidavit and MRJ and his hearing testimony. So it is not a fine distinction. It is a completely different conversation he's describing. You know, if he hadn't been given this advice, which is, I guess, the state's position, why would he have taken the chance of going to trial? I mean, here he's already a prior offender, right? I thought that he was. And he twice sold cocaine to a government informant. So, I mean, you'd think, hey, if I go to trial, I'm almost certainly going to be convicted. I mean, you know, did he really have any defense, any practical defense at trial? I mean, with the benefit of hindsight, we could say no, but the defense was the only person who could identify him was the CI, right? There was no independent corroboration from anyone else that he was actually the one selling the drugs. The CI was a drug addict. The CI was in trouble, was trying to get out of trouble, and wanted to name him. That was the defense. Now, it didn't work, but it was a defense, and he took a chance. He rolled the dice on a possibility of acquittal. The other thing that is possible is that Mr. Farra said, my prediction is that you will not get consecutive sentencing. I believe that the judge will exercise her discretion to not give consecutive sentencing. Now, that's a prediction that turned out to be a mistake. It has never been claimed that if that prediction was made, that that was ineffective assistance of counsel. And it wasn't, if that was the prediction. The claim is that Mr. Farra said, legally speaking, there is no possibility that you could get consecutive sentencing. That would be ineffective. That would be deficient performance. But if Mr. Farra said, the CI has credibility issues, the CI is a drug addict, no other witness can identify you, you can roll the dice on getting an acquittal. If you get convicted, most likely, you'll probably get concurrent sentences anyway. And Farra's testimony was that he didn't think he gave him a recommendation. He just laid out the options, right? Is it your position, then, that insofar as what the lawyer did or didn't say, what Mr. Torres says that he said is completely inconsistent with the argument that the lawyer made shortly after that conversation allegedly occurred when the lawyer argued in court? Right, exactly. So is there any explanation that anybody tries to advance as to why he would have allegedly said one thing when he was meeting with his client about the plea and then made an argument in court not that long afterwards that both shows he did understand what the law was and he made an exact opposite argument to the judge? No, the only explanation that Mr. Torres has advanced is that Mr. Farra was a bad lawyer. He suffered from depression. He considered suicide. He neglected legal matters in unrelated cases. It's all the sort of unrelated stuff that is used to impugn his character, and, I mean, fairly so. I guess he was disbarred. I can't say he wasn't a bad lawyer, but he has to show not that he was a bad lawyer, but that he specifically gave this particular deficient advice in this particular case. Now, Mr. Farra's testimony at the deposition was, I always knew about the sentencing consequences because that's what plea deals were based on, right? The plea agreement was always based on something to do with sentencing. That's the whole point of it. And often it's to avoid consecutive sentencing, right? That's often the case. I always carry the sentencing guidelines with me. I absolutely agree with what I heard my sister say, which is the sentencing guidelines in Michigan are fairly complicated, right? And so that is why Mr. Farra, who testified that he was too good at his job, right? That was his deposition testimony. Of course he carried the sentencing guidelines. Of course he educated himself as to whether there were consecutive sentencing and whether the plea agreement would somehow avoid that. Of course he did. So this sort of belated claim raised two and a half years after he learned about it. And, again, at sentencing, the judge didn't ask him, you know, did your attorney meet the standards set forth in Strickland v. Washington, right? The judge didn't ask him, did your attorney render performance that satisfied an objective level of reasonableness? The judge asked him if he was satisfied with his attorney's performance. If you hear Mr. Torres' story, he was in shock having learned that this major decision he had made in his life might cost him an extra, you know, potentially 80 years in prison. I mean, that's the top end, so it's not likely, but potentially 80 years of his life based on the advice he had gotten from him. And he says, yes, I'm satisfied with my counsel's advice. Now he wants us to believe that was a lie because he lies when he doesn't see a benefit to telling the truth. I think that he was satisfied with his counsel's advice because I think that the worst counsel might have said is the same thing Joanne Hawley said, which is you'll probably get concurrent sentences, right? And if that's what he said, that wasn't deficient performance. And so I think that there's no reconciling his stories about his conversation with Mr. Archer, his claims about Mr. Archer's supposed dismissiveness. We know from Mr. Archer's notes he wasn't refusing to discuss consecutive sentencing because that was in his notes and it was in the appellant's brief. He wasn't refusing to discuss weak issues because the insufficiency claim, which he thought was weak, was in his notes. It was in the appellant's brief, right? So we know Mr. Archer's not dismissive of these claims. He raises the claims, right? We know that he didn't raise this, which is what his last testimony was, that I didn't raise this, but then that contradicts his earlier testimony. My sister cited to pages 1004 and 1005 of the record where she explains where he first understood that he had this potential claim to raise. Now that testimony is Mr. Torres describing his preparation of his Michigan Supreme Court application on direct appeal where he did not raise this claim, despite raising three not previously raised claims of Mr. Farra's ineffective assistance. And we raised this before. The district court didn't assign a lot of relevance to it. I think it's hugely relevant that in the Michigan Supreme Court, pro se, he's raising all these claims. He's raising three ineffective assistance claims. He's citing facts. He's citing law. He's citing to the record. He's developing the claims. Never once mentions, also, I got this deficient advice on consecutive sentencing. I think it's a big fact. I think, Your Honors, I've covered most of what I was going to say. It's not correct that by the time of direct appeal he had set aside the issues of his guilt or innocence. In fact, the insufficiency claim was raised on direct appeal. So that's another sort of minor mistake. My sister mentioned Lewis v. Stretke. It's a very different case. In Lewis, this court overturned the district court's factual findings because the district court had ignored certain facts and actually got some things wrong in terms of not understanding the record. The district court found that these claims were uncorroborated. In fact, this court held that they were corroborated. That was a problem. So those are a few minor points, but I'd be glad to answer any other questions that the judges, that Your Honors, may have. Otherwise, I would rest on these arguments in our brief. All right. Thank you. Request for comments. I'd like to begin by addressing Judge McKee's question about hearing Mr. Farah at sentencing argue about the issue of consecutive and concurrent sentences. At this point in time, Mr. Torres has already been asked by the court, are you satisfied with your lawyer? At that time, he didn't know. Because he didn't know what was going to happen and nobody had told him. Is something happening right in that proceeding that is just starkly contrary to what that same lawyer allegedly told him? At this point, the problems already happened. Mr. Torres has already rejected the plea offer and already gone to trial. So perhaps at this point, he's in shock. But the other thing that he doesn't know, and he's still resting on his attorney's assurances, that he probably will not get consecutive sentences. And so at that point, it's don't rock the boat. So he hadn't really sort of gotten the bad news at that point. Correct. But you just changed your theory there, didn't you, when you just described the advice as saying he probably won't get consecutive sentences? That's not ineffective assistance. Your claim was he was told that he couldn't get consecutive sentences. No, Your Honor. So therefore, there's no risk going to trial. I want to be very clear about the timing of things. So the first conversation about the plea offer that Mr. Hartung extended at the preliminary examination and then immediately before trial and the conversations that they had there, that is the core of the ineffective assistance of counsel claim. Right before sentencing, Mr. Torres testified that he met with Mr. Farah and they discussed what would happen at the sentencing hearing. And that was where Mr. Farah said, you're still probably going to get concurrent sentences. So the ineffective assistance had already happened at the moment when he rejected the plea, and that's really what we're focusing on. But we're trying to figure out whether whose version is correct. It just seems like what happened at the sentencing is completely inconsistent with what your client says he was told in connection with the plea proceeding. So I'm just trying to figure out, one, is it inconsistent, and two, what conclusion do we draw from that? I don't think it is inconsistent, and I think one thing that we're also overlooking is the issue of the doubling of the guidelines. So at that point, the advice that Mr. Farah gave Mr. Torres right before he rejected the plea is the core of this. By the time they're at the sentencing, the guidelines can already be doubled. The sentences can already be stacked. And so at that point, Mr. Torres is just holding out hope that the worst won't come to pass. And so it's not inconsistent that Mr. Farah told him that there was little benefit to this plea offer, and then at sentencing tried to mitigate that harm. All right. Thank you, Ms. Fitzgerald. Thank you. Those are your arguments in case you want to submit it. The clerk may call the next case.